## STATE OF CONNECTICUT *v.* SHELTON ADAMS, JR.
## (14445)

PETERS, C. J., BORDEN, BERDON, NORCOTT and SANTANIELLO, Js.

Argued December 2, 1992—decision released March 30, 1993

*Elizabeth M. Inkster,* assistant public defender, with whom, on the brief, were *G. Douglas Nash,* public defender, and *Richard Emanuel,* assistant public defender, for the appellant (defendant).

*Susann E. Gill,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Shelton Adams, Jr., was charged in a substitute information with the crimes of felony murder, conspiracy to commit robbery, first degree robbery and carrying a pistol without a permit in violation of General Statutes §§ 53a-54c, 53a-48, 53a-134 (a) (2) and 29-35, respectively. After a jury trial, the defendant was convicted of felony murder, first degree robbery and carrying a pistol without a permit and was acquitted on the conspiracy count.[1] The

[1] The pertinent parts of the statutes under which the defendant was convicted are as follows: "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

"[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime . . . or of immediate flight

trial court sentenced the defendant to a total effective term of fifty-five years imprisonment. The defendant appealed to this court from the judgment of conviction pursuant to General Statutes § 51-199 (b). We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. During the month of April, 1990, the defendant resided with his father, Shelton Adams, Sr., and his aunt in a first floor apartment of a three-family house located at 58-60 Warren Place, New Haven. On the evening of April 15, 1990, the defendant and Sherman Sims approached Nathan Roberts, who lived on the second floor of the same house, and asked him for a gun. Roberts gave the defendant a .38 caliber handgun.

At approximately 2:48 a.m. on April 16, Sims and the defendant called for a taxicab to pick them up at 1561 Chapel Street and to take them to 230 Blatchley Avenue. The Metro Taxi Company dispatched a cab operated by the victim, Allen Hansen, to respond to the call.

When the cab arrived at the Chapel Street location, both the defendant and Sims sat in the back seat with Sims seated behind the victim. As the victim drove down Blatchley Avenue, Sims ordered him to pull over behind the Columbus School. The victim complied. Sims then pulled out a gun, placed it to the victim's neck and fired the gun. Sims had been holding the victim with

therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

"[General Statutes] Sec. 29-35. CARRYING OF PISTOL OR REVOLVER WITHOUT PERMIT PROHIBITED. EXCEPTIONS. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . .

"(b) The holder of a permit issued pursuant to section 29-28 shall carry such permit on his person while carrying such pistol or revolver."

his left hand when he fired the gun, and consequently he suffered a bullet wound to his left pinkie finger.

Sims and the defendant exited the cab from the left, or driver's, side and pulled the victim from the vehicle onto the ground to allow easier access to his pockets. They then took both of the victim's wallets.[2] The victim died almost immediately after the shooting. Powder burns found around the entry wound indicated that the gun had been held against the victim's skin when fired.

Sims and the defendant then walked back to the defendant's apartment. The defendant's father let the two men in and a few minutes later noticed that the defendant was wrapping Sims' bleeding hand. A short while later, Sims and the defendant called for another cab to take them to 28 Ellsworth Avenue, where a friend resided.

At 7:15 a.m., Roberts encountered Sims and the defendant walking toward the defendant's apartment. Roberts had heard about the shooting and asked the defendant if he knew anything about it. Neither the defendant nor Sims responded. Roberts then asked about the handgun that he had given to the defendant the previous night. The defendant first denied knowledge of the whereabouts of the gun, and then claimed that he had thrown it away. Roberts then noticed Sims' bleeding hand and asked the defendant whether he had shot the victim. In response, the defendant pointed at Sims.

Later that morning, the defendant asked his father to dispose of the handgun. The defendant, his father, and Sims were driven by a friend to the bank of the

---

[2] According to the testimony of the victim's wife, her husband habitually carried two wallets, one in his front pants pocket and one in his rear pants pocket.

Mill River near East Rock Road. The defendant's father then threw the gun into the river.

With the assistance of the defendant's father, the New Haven police later retrieved the gun from the river. Ballistic tests performed on the gun established that it had fired the shot that had killed the victim. The police also conducted a search of the defendant's apartment in which they found a jacket identified as the one worn by the defendant on the night of the shooting. The left sleeve of the jacket was encrusted with blood that later tested to be of the same type as that of the victim.

The defendant's theory of defense focused on his lack of criminal intent. Through the testimony of New Haven police detective Anthony DiLullo during the state's case-in-chief, the defendant's version of the shooting was elicited. DiLullo testified that he had met with the defendant the day after the shooting at which time the defendant had given DiLullo a voluntary statement. The defendant admitted being with Sims on the night of the homicide and being in the victim's cab with Sims before the shooting. The defendant was seated on the right, or passenger's, side of the back seat of the cab. When the cab stopped at the traffic light at the intersection of Blatchley and Grand Avenues, Sims pulled out a silver colored handgun. The defendant told DiLullo that at this point he had left the cab through the right rear door and had run away. The defendant claimed that he had never seen the gun before and that he had had no idea that Sims was planning to rob the cab driver. He also stated that he had heard a gunshot when he was approximately one and one-half blocks away from the cab.

On appeal, the defendant claims that the trial court improperly: (1) denied his motion for judgment of acquittal as there was insufficient evidence to support

the jury's guilty verdict; (2) violated his constitutional due process and statutory rights by denying his request to instruct the jury on the defense of renunciation pursuant to General Statutes § 53a-10; and (3) instructed the jury on consciousness of guilt and reasonable doubt so as to dilute the state's burden of proof in violation of the defendant's constitutional due process rights. We disagree with each of these claims.

## I

The defendant first claims that the trial court should have granted his motion for judgment of acquittal because the state produced insufficient evidence to sustain his conviction of felony murder, first degree robbery and carrying a pistol without a permit. He claims that the state's failure to prove beyond a reasonable doubt each element of the crimes charged against him deprived him of his due process rights under the federal and state constitutions.[3]

---

[3] The defendant claims that the insufficiency of the evidence violated his due process rights under both the federal and state constitutions. See U.S. Const., amend. XIV; Conn. Const., art. I, § 8. The defendant has not presented a separate analysis for his state constitutional claims. Accordingly, we limit our analysis to the relevant federal constitutional claim. See *State* v. *Joly,* 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991).

The defendant concedes in his brief that he did not preserve the insufficiency of the evidence claim regarding the count of carrying a pistol without a permit at trial by moving for judgment of acquittal on that count. He therefore claims that he is entitled to prevail on this claim under *State* v. *Evans,* 165 Conn. 61, 69–70, 327 A.2d 576 (1973), and *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

The United States Supreme Court held in *Jackson* v. *Virginia,* 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), that the fourteenth amendment commands that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." If an appellate court is presented with an insufficiency of the evidence claim, reversal is constitutionally required if, "after viewing the evidence in the light most favorable to the prosecution,

The defendant argues that the evidence failed to establish beyond a reasonable doubt his participation in the crimes for which he was convicted. He argues that the state failed to refute his claim that he lacked knowledge of Sims' intentions, that he was essentially an innocent bystander, and that he fled the cab prior to the shooting. The defendant claims, therefore, that because the evidence was insufficient to preclude a reasonable hypothesis that he left the scene of the crime before the shooting, it was insufficient to find him guilty beyond a reasonable doubt of the felony murder and robbery counts. The defendant also argues that there was no evidence presented at trial to support beyond a reasonable doubt the conclusion that on the day of the offense the defendant carried a pistol without a permit. We disagree.

"In reviewing a claim of insufficiency of the evidence, this court construes the evidence in the light most favorable to sustaining the jury's verdict and will affirm that verdict if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Citation omitted.) *State* v. *Ruscoe,* 212 Conn. 223, 245, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990). "While the jury must find every element proven beyond a reasonable doubt in order to find the

[no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id., 319.

We believe that *Jackson* v. *Virginia,* supra, compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding.* There being no practical significance, therefore, for engaging in a *Golding* analysis of an insufficiency of the evidence claim, we will review the defendant's challenge to his conviction on the count of carrying a pistol without a permit as we do any properly preserved claim.

defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. *State* v. *Castonguay*, 218 Conn. 486, 507, 590 A.2d 901 (1991). If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991). . . . *State* v. *Pinnock*, 220 Conn. 765, 770–71, 601 A.2d 521 (1992)." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 678, 613 A.2d 788 (1992). "In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Avis*, 209 Conn. 290, 309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989).

To convict the defendant of the crimes as charged in the substitute information, the state had to prove the following beyond a reasonable doubt. Regarding the charge of felony murder in violation of General Statutes § 53a-54c, the state needed to prove that: (1) the defendant, acting alone or with another participant, committed or attempted to commit robbery; and (2) in the course of or in furtherance of the robbery, he or another participant caused the death of the victim. To convict the defendant of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), the state bore the burden of proving beyond a reasonable doubt that in the course of the commission of a robbery[4] or

---

[4] Under General Statutes § 53a-133, "[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate

immediate flight therefrom, the defendant or another participant was armed with a pistol. The charge of carrying a pistol without a permit in violation of General Statutes § 29-35 required the state to prove that the defendant carried a pistol or revolver without a permit outside of his home or place of business.

Nothing in our criminal jurisprudence mandates that a jury accept a defendant's version of events or the reasonable inferences that flow therefrom. The jury is free to juxtapose conflicting versions of events and to determine which is the more credible. See, e.g., *State* v. *Bunkley,* 202 Conn. 629, 645, 522 A.2d 795 (1987); *State* v. *Banks,* 194 Conn. 617, 619, 484 A.2d 444 (1984). Should it determine, as it did here, that the state has proven beyond a reasonable doubt facts constituting the elements of the crimes charged, its responsibility is to return verdicts of guilty. "We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Henning,* 220 Conn. 417, 420, 599 A.2d 1065 (1991).

Applying these standards to this case, we conclude that the evidence presented by the state could reasonably have persuaded the jury, beyond a reasonable doubt, that the defendant was guilty of felony murder,

use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." The element that distinguishes larceny from robbery, therefore, is the use or threatened use of immediate physical force. *State* v. *Crosswell,* 223 Conn. 243, 250, 612 A.2d 1174 (1992).

first degree robbery and carrying a pistol without a permit. A review of the record reveals the following evidence in support of the convictions. The uncontroverted testimony of Roberts established that, prior to the crimes, the defendant had obtained a handgun from Roberts, for which the defendant had no permit. Through the voluntary statement given to DiLullo, the defendant himself confirmed that he had been in the cab with Sims and that he had been with Sims after the shooting. The records of the Metro Taxi Company corroborated that Sims and the defendant were together both before and after the homicide, taking cabs to and from various parts of the city. The morning following the shooting, the defendant gave a handgun to his father, who, at the defendant's request, threw the handgun into the Mill River. A ballistics expert testified that the bullet that had killed the victim had been discharged from the handgun that Roberts had loaned to the defendant and which the police subsequently had retrieved from the river.

Furthermore, a jacket found during a search of the defendant's apartment was identified by Roberts and the defendant's father as one worn by the defendant during the early morning hours on the day of the crime. Expert testimony concluded that blood encrusted on the left sleeve of this jacket was consistent with the unusual blood type of the victim.[5] Also, testimony of investigating police officers revealed that the right rear door, through which the defendant claimed he had

---

[5] Mary Beth Gouman, a forensic expert for the state, tested the blood on the sleeve of the defendant's jacket to determine blood grouping types and to discover the presence of isoenzymes, a chemical substance in the blood that differs among individuals. Gouman testified that she found the blood grouping type to be "A" and the isoenzyme type to be "PGM two minus one plus," both of which corresponded to the victim's types. She further testified that approximately two percent of the national population share this blood type.

exited the cab prior to the shooting, had been locked when the victim's body was discovered.[6]

The state's theory was that Sims, with a severely bleeding left hand, would have needed an accomplice to help him drag the victim from the cab and remove his wallets in order for the wallets to remain free of blood. The pooling of the victim's blood to the right of the front seat, a blood smear on the left rear door, the position of the victim's body and the vehicle when discovered, and the lack of any traces of blood on one of the victim's wallets, which was later recovered by the police, all supported the state's theory that the defendant was present when the victim was shot, and that he aided Sims in pulling the victim from the cab and removing the victim's wallets.

The jury could also reasonably have inferred the defendant's consciousness of guilt from his statements to the police after the murder that he had never before seen the gun that killed the victim despite testimony that he had obtained it from Roberts and that he had given it to his father the morning after the shooting. Furthermore, the defendant's gesturing to Sims when Roberts asked him if he had shot the victim indicated the defendant's personal knowledge of the shooting.

The defendant argues that because this evidence did not disprove his version of the facts,[7] and because it

---

[6] At trial, David Low, an expert witness regarding the locking mechanism of the victim's cab, a 1984 Buick LeSabre, testified that the position of the right rear door "lock bar" of the cab when discovered by the police rendered the defendant's claim that he had exited the cab through that door implausible.

[7] The defendant told DiLullo that he had left the cab before the shooting and that he had no knowledge of Sims' intention to rob the cab driver. He offered as an explanation for the presence of blood on his jacket that the victim's blood may have dripped onto his jacket when he was tending to Sims' wounded hand after the shooting. The defendant further contended that Roberts did not accurately remember when he loaned the gun to the defendant, and that there was no evidence that the defendant intentionally supplied the gun to Sims for the purpose of aiding in the robbery.

did not reveal that he possessed the handgun outside of his home, it was insufficient to sustain a guilty verdict. " '[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence.' . . ." *State* v. *Grant,* supra, 604. When conflicting explanations are presented, the trier is entitled to reject, as less credible, testimony and inferences offered on behalf of the defendant. *State* v. *Roseboro,* 221 Conn. 430, 437, 604 A.2d 1286 (1992). In rejecting the defendant's version of the surrounding events, the jury concluded that the evidence supported the state's assertion that the defendant and Sims were together immediately before, during and after the robbery and shooting. Furthermore, it was reasonable for the jury to infer from the evidence that the defendant, outside of his home, possessed the handgun used in the shooting. We conclude, therefore, that the cumulative effect of the evidence was sufficient to permit the jury to find the essential elements of felony murder, first degree robbery and carrying a pistol without a permit and to persuade the jury of the existence of those elements beyond a reasonable doubt.

## II

The defendant next claims that the trial court improperly denied his request to instruct the jury on the defense of renunciation pursuant to General Statutes § 53a-10. He claims that the denial of this instruction violated his federal and state constitutional rights to due process and to present a defense pursuant to § 53a-10.[8] We disagree.

---

[8] General Statutes § 53a-10 provides in relevant part: "(a) In any prosecution in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8, it shall be a defense that the defendant terminated his complicity prior to the commission of the

The defendant's theory of defense was that he fled the cab before Sims shot the victim and that he had no prior knowledge of Sims' criminal intentions when the two men entered the victim's cab. The state requested that the jury be charged on felony murder, which included a charge on accessorial liability under General Statutes § 53a-8.[9] The defendant subsequently requested that the jury be charged on the defense of renunciation under § 53a-10, a defense which is only available in prosecutions based upon the conduct of another person under the provisions of § 53a-8.[10]

The trial court granted the state's request to charge on felony murder, including accessorial liability, but denied the defendant's request to charge on the defense of renunciation. The defendant claims that the jury should have been instructed on renunciation because evidence had been introduced that he renounced any complicity by fleeing the cab when Sims pulled out the

---

offense under circumstances: (1) Wholly depriving it of effectiveness in the commission of the offense, and (2) manifesting a complete and voluntary renunciation of his criminal purpose."

[9] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[10] The defendant requested that the language of General Statutes § 53a-10 be read to the jury and that the following instruction be given:

"In this case, evidence has been offered that when Sherman Sims pulled out a gun while he and Mr. Adams were in the taxi, Mr. Adams jumped out of the cab and ran away.

"If the jury accepts this evidence and finds that Mr. Adams terminated his complicity prior to the shooting of Mr. Hansen under circumstances wholly depriving any complicity on his part of any effectiveness in the commission of felony murder and that from the cab and running away Mr. Adams manifested a complete and voluntary renunciation of a criminal purpose, you must find him not guilty of felony murder.

"Where the defense of renunciation is raised by evidence in the case, the State has the burden of disproving such defense beyond a reasonable doubt."

gun. The defendant's understanding of the defense of renunciation, however, is misplaced.

"A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Belle,* 215 Conn. 257, 273, 576 A.2d 139 (1990). We have said that a defendant is entitled to have the court present instructions to the jury relating to any theory of the defense for which there is any foundation in the evidence, even if weak or incredible. Id.; *State* v. *Fuller,* 199 Conn. 273, 278, 506 A.2d 556 (1986). We must consider the evidence presented at trial in the light most favorable to supporting the defendant's request to charge. *State* v. *Fuller,* supra, 279. An instruction on a legally recognized theory of defense, however, is warranted only if the evidence indicates the availability of that defense. See *State* v. *Belle,* supra; *State* v. *Fuller,* supra, 278; *State* v. *Harris,* 189 Conn. 268, 274, 455 A.2d 342 (1983); *State* v. *Rosado,* 178 Conn. 704, 708, 425 A.2d 108 (1979). The trial court should not submit an issue to the jury that is unsupported by the facts in evidence. *State* v. *Rodgers,* 198 Conn. 53, 56, 502 A.2d 360 (1985).

The defendant was entitled to have the court instruct the jury on the defense of renunciation if there was any evidence to raise a reasonable doubt concerning the existence of the defense. *State* v. *Cassino,* 188 Conn. 237, 243, 449 A.2d 154 (1982). The question on appeal is whether, viewing the evidence most favorable to the defendant's request for charge, we perceive any evidence supporting a defense of renunciation presented at trial. Having undertaken the appropriate review, we conclude that there was no evidentiary basis to support a defense of renunciation and consequently that the court correctly refused to instruct the jury on that defense.

At the outset, we note that the defense of renunciation is extremely narrow. " 'Renunciation' generally requires not only desistance, but more active rejection, and usually contains specific subjective requirements, such as a *complete* and *voluntary* renunciation." (Emphasis in original.) 1 P. Robinson, Criminal Law Defenses (1984) § 81 (a), p. 347. Connecticut has patterned its criminal code after the Model Penal Code, which permits the defense only if the defendant terminates his complicity by, inter alia, *wholly depriving* his complicity of its effectiveness in the commission of the offense. 1 P. Robinson, supra, pp. 363–64; see General Statutes § 53a-10; I A.L.I., Model Penal Code and Commentaries (1985) § 2.06 (6) (c), comment, p. 326 (hereinafter A.L.I. Model Penal Code). A mere change of heart or flight from the crime scene does not establish the defense of renunciation. Rather, it is necessary that the defendant accomplice both repudiate his prior aid and deprive that aid of effectiveness. 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 6.8 (d), p. 162.

"If the prior aid consisted of supplying materials to be used in commission of the offense, effective withdrawal may require that these materials be reacquired so as to prevent their use by the principal." Id.; see A.L.I. Model Penal Code, supra, § 2.06 (6) (c), comment, p. 326. The action needed to deprive a prior action of its effectiveness will vary from case to case. Id. Indeed, it is conceivable that some actions that serve as the basis for accessorial liability are impossible to renounce given the practical constraints involved in depriving some actions of their effectiveness. Under Connecticut law, for a charge on the defense of renunciation to be warranted, there must be evidence not only that the defendant completely and voluntarily renounced his participation in the crime, but also that he did so in such

a way as wholly to deprive or neutralize his participation of its effectiveness.

There is no evidence in the record before us that the defendant took any steps, beyond abandoning the cab, to deprive his complicity of its effectiveness. The sole theory of accessorial liability relied upon by the state was its claim that the defendant had, with the requisite intent, supplied the gun to Sims. The defendant's participation in the offense prior to its completion was established through the evidence indicating that he had procured the murder weapon and that he had been present when Sims held it to the victim, permitting an inference that the defendant had supplied Sims with the gun. When the act of complicity consists of providing arms, "a statement of withdrawal ought not to be sufficient; what is important is that he get back the arms, and thus wholly deprive [the] aid of its effectiveness in the commission of the offense." A.L.I. Model Penal Code, supra, § 2.06 (6) (c), comment, p. 326. Depriving this act of its effectiveness would have required a further step, such as taking back the weapon, disposing of it so that it could play no role in the robbery, or warning the police so as to thwart the use of the weapon in the crime.[11]

A mere claim of innocence or denial of participation in the crime charged does not, without more, entitle a defendant to a theory of defense charge. *State* v. *Cassino,* supra, 242. This is particularly true regarding the defense of renunciation, pursuant to § 53a-10, to a charge of accomplice liability under § 53a-8.

The defendant's evidence did not tend to show that he had "terminated his complicity" in the offenses

---

[11] We note, however, that we do not set forth in this opinion an exclusive set of possibilities for renouncing the defendant's aid; rather, we conclude that under these facts the defendant's claimed act of renunciation was legally insufficient to permit the jury to be charged on the defense.

charged by meeting both of the requirements of
§ 53a-10—i.e., (1) manifesting a complete and volun-
tary renunciation of criminal purpose, and (2) complete
deprivation of the effectiveness of his complicity in the
crimes. It tended to show only that he *had* no such com-
plicity. That is a claim that he was not an accomplice
under § 53a-8. It is not a claim, cognizable under
§ 53a-10, that his accomplice liability under § 53a-8 had
been terminated.

In other words, § 53a-10, by its specific terms, recog-
nizes a defense only to a charge of accomplice liability
under § 53a-8. It does not provide a general defense
to a crime charged in which the state does not seek to
hold the defendant criminally liable as an accomplice
under § 53a-8. Thus, even if the jury believed the
defendant's version of the events—namely, that he was
an innocent "bysitter" who fled the cab as soon as he
realized the nature of Sims' intentions—or disbelieved
the state's version, namely, that he supplied the gun
to Sims, no instruction under § 53a-10 would have been
warranted. Indeed, to hold otherwise would read sub-
division (1) out of § 53a-10 (a) in virtually all cases.

The defendant also claims that the court's failure to
charge on the defense of renunciation under § 53a-10
violated his statutory rights. The defendant argues
that the failure of the trial court to apply a clearly
relevant statute to the case before it constituted plain
error. The defendant's claim suggests that § 53a-10
provides a defendant with a right to have the jury
charged on the defense of renunciation whenever a
defendant is charged with liability for the acts of
another person pursuant to § 53a-8. Although § 53a-10
affords a defense when a defendant is charged with lia-
bility for the acts of another, it in no way absolves the
defendant of the responsibility of providing an eviden-
tiary foundation for any defense on which the jury is
to be instructed. See, e.g., *State* v. *Cassino*, 243; *State* v.

*Rosado,* supra, 707–708. The defendant failed to provide such an evidentiary foundation. We conclude, therefore, that the trial court properly refused to charge the jury on the defense of renunciation.

## III

The defendant's final contention is that the trial court's instructions to the jury regarding "consciousness of guilt" and "reasonable doubt" unconstitutionally diluted the state's burden of proof. At trial, the defendant objected to the trial court's instruction on consciousness of guilt on a basis other than the one asserted before this court. Furthermore, the defendant did not object to the trial court's instructions on reasonable doubt. Neither of these claims, therefore, was preserved at trial.[12]

"A defendant can prevail on an unpreserved claim only if *'all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged con-

---

[12] It is well established that to raise an objection in the trial court, counsel should state the basis of his objection in such form as he desires it to go on record. *State* v. *Paulino,* 223 Conn. 461, 476, 613 A.2d 720 (1992). Once an objection has been made and the grounds stated, a party is normally limited on appeal to raising the same objection on the same basis as stated at trial. *State* v. *Brice,* 186 Conn. 449, 457, 442 A.2d 906 (1982). To assign error in the court's rulings on the " 'basis of objections never raised at trial amounts to trial by ambuscade of the trial judge. . . .' " Id.

Before the trial court, the defendant objected to the charge on consciousness of guilt on the theory that the jury should have been told that, if it found a reasonable explanation for the defendant's false exculpatory statement, it was "entitled to consider that other reason as not showing consciousness of guilt." Before this court, however, the defendant challenges the use of the language "guilty connection" in the charge, claiming that it diluted the state's burden of proof by suggesting that if the jury disbelieved the defendant's exculpatory statement, it must necessarily assume the defendant's guilt. Therefore, in changing the basis of his objection to the charge on consciousness of guilt, the defendant has raised an unpreserved claim.

stitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate the harmlessness of the alleged constitutional violation beyond a reasonable doubt.' (Emphasis in original.) *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989)." *State* v. *Milardo,* 224 Conn. 397, 408, 618 A.2d 1347 (1993).

The jury was instructed that if it should find that the defendant had made false statements about himself or his whereabouts at the time of the offense it would have the right to take such misstatements as proof of the defendant's consciousness of his own guilt.[13] This instruction was directed specifically at the defendant's statements to DiLullo claiming that he had never before seen the handgun used to shoot the victim.[14] On appeal,

---

[13] The full text of the trial court's charge on "consciousness of guilt" was as follows: "There is a concept in the law called consciousness of guilt. Whenever a person is on trial for a criminal offense, it is proper to show his conduct as well as any declarations made by him subsequent to the alleged criminal act. The manner in which he conducted himself when accounts by others in respect to this subject were made in his hearing may also be shown. If he should make false statements respecting himself or as to his whereabouts at the time of the affair, these may be shown, because such conduct or such statements often tend to show a guilty connection by the accused with the crime charged.

"The state claims in this case that the accused made false statements to Detective DiLullo pertaining to several matters. The state claims these include the accused's statements [that] he had never before seen the weapon which he claims Mr. Sims had in the victim's taxicab. I charge you that it is your recollection of the evidence which controls in this regard. Also, I instruct you that you must be satisfied beyond a reasonable doubt that if misstatements were made by the accused, that the accused made them or the misstatements were in order for this rule to apply. I also charge you that a misstatement of a suspect to police officers is admissible against him in a later prosecution because it permits the jury to draw the reasonable inference that the misstatement was made in attempt to avoid detection for the crime."

[14] The defendant's claim at trial was that there was an innocent explanation for the false statement concerning the handgun, namely, that

the defendant objects to the portion of the instructions stating that "such statements often tend to show a *guilty connection* by the accused with the crime charged." (Emphasis added.) The defendant claims that this instruction diluted the state's burden of proof by permitting the jury to presume that the opposite of the defendant's false statement had been established as an affirmative fact. We are not persuaded.

We have previously recognized that a claim challenging an instruction that mandates a particular inference adverse to the defendant may sufficiently implicate constitutional rights to satisfy the second prong of *Golding*. *State* v. *Smith,* 219 Conn. 160, 165, 592 A.2d 382 (1991). "A jury charge in which the court removes from the jury's consideration an issue that is one of the essential elements of the crime, and thereby relieves the state of the burden of proving every element beyond a reasonable doubt, would violate the holding of *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)." *State* v. *Tillman,* 220 Conn. 487, 503, 600 A.2d 738 (1991), cert. denied, U.S. , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992). In the present case, however, the language "guilty connection" did not mandate that the jury find that the facts about which the defendant had made false statements were conclusively established. Rather, the instruction as a whole identified a permissive inference of consciousness of guilt that the jury might draw from the defendant's false statement, an item of circumstantial evidence. *State* v. *Smith,* supra; see *State* v. *Thomas,* 214 Conn. 118, 121, 570 A.2d 1123 (1990); *State* v. *DeMatteo,* 186 Conn. 696, 702, 443 A.2d 915 (1982).

"Unpreserved nonconstitutional claims such as this 'do not warrant special consideration simply because

he had not admitted to seeing the handgun in order to cover for Roberts, who had given it to him.

they bear a constitutional label.' *State* v. *Golding,* supra, 240." *State* v. *Smith,* supra, 166. In reviewing a constitutionally based challenge to the court's instruction to the jury, we must examine the charge as a whole to determine whether it is reasonably possible that the jury was misled by the challenged instruction. *State* v. *Bailey,* 209 Conn. 322, 338, 551 A.2d 1206 (1988). It is not reasonably possible that the trial court's instructions on consciousness of guilt, taken as a whole, misled the jury into shifting the burden of proof to the defendant. See *State* v. *Brown,* 199 Conn. 14, 28, 505 A.2d 690 (1986). Because the defendant failed to demonstrate that this claim is of constitutional magnitude alleging a violation of a fundamental right; *State* v. *Golding,* supra, 239–40; the defendant cannot prevail on this unpreserved claim.

The defendant also contends that the trial court's charge on reasonable doubt unconstitutionally diluted the state's burden of proof. The defendant takes issue with the portions of the charge that stated "[a] reasonable doubt is a doubt for which a valid reason can be assigned" and "is such a doubt as in serious affairs which concern yourselves you would pay heed."[15] The

[15] The full text of the court's charge on reasonable doubt is set forth below: "Now before you can render a verdict of guilty, I as I have said, the state must prove every essential element of the crime charged beyond a reasonable doubt. This phrase reasonable doubt has no technical or unusual meaning. You get the real meaning of the phrase if you emphasize the word reasonable.

"A reasonable doubt is a doubt for which a valid reason can be assigned. It is a doubt which is something more than a guess or a surmise. A reasonable doubt is not such a doubt as raised by one who questions simply for the sake of argument. It is not a doubt suggested by the ingenuity of counsel which is not warranted by the evidence. A reasonable doubt is a real doubt, an honest doubt, a doubt which has its foundation in the evidence offered in the case or in the absence of evidence. It is such a doubt as in serious affairs which concern yourselves you would pay heed. It is such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance.

"Absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of a jury before it

defendant argues that this language suggested that a reasonable doubt is only one that a juror can articulate and for which a juror can assign a reason.

This court has previously reviewed similar language in jury charges on reasonable doubt and has consistently rejected the proposition that such language amounts to a constitutional error. *State* v. *Jeffrey,* 220 Conn. 698, 719, 601 A.2d 993 (1991), cert. denied, U.S. , 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992); *State* v. *Ireland,* 218 Conn. 447, 457, 590 A.2d 106 (1991); *State* v. *Thomas,* supra, 119; *State* v. *Leecan,* 198 Conn. 517, 538–39, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986). When read in the context of the complete charge, these instructions did not dilute the defendant's presumption of innocence or reduce the state's burden of proof. We conclude that the defendant has failed to demonstrate a violation of a fundamental constitutional right.

The judgment is affirmed.

In this opinion PETERS, C. J., BORDEN and SANTANIELLO, Js., concurred.

BERDON, J., dissenting. I disagree with the majority's conclusion that the defendant was not entitled to an instruction on the defense of renunciation. The defendant, under the facts of this case, had a constitutional right to have the jury instructed on this defense under General Statutes § 53a-10.[1] "A fundamental element

---

returns a verdict of guilty. What the law does require, however, is that if after hearing all the evidence there is something in that evidence or lack of evidence which leaves in the minds of the jury as reasonable men and women a reasonable doubt of the guilt of the accused, then the accused must be given the benefit of the reasonable doubt and acquitted."

[1] General Statutes § 53a-10 provides: "(a) In any prosecution in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8, it shall be a defense that the defendant terminated his complicity prior to the commission of the offense under circum-

of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) . . . ." (Citation omitted.) *State* v. *Rouleau,* 204 Conn. 240, 243, 528 A.2d 343 (1987). "When the legislature has created a legally recognized defense, the defendant is entitled to a proper jury instruction on the elements of that defense so that the jury may ascertain whether the state has sustained its burden of disproving the defense beyond a reasonable doubt." *State* v. *Havican,* 213 Conn. 593, 598, 569 A.2d 1089 (1990); *State* v. *Fuller,* 199 Conn. 273, 278, 506 A.2d 556 (1986). This court, sitting en banc, has unanimously held[2] that "a defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." (Internal quotation marks omitted.) *State* v. *Belle,* 215 Conn. 257, 275, 576 A.2d 139 (1990).[3]

stances: (1) Wholly depriving it of effectiveness in the commission of the offense, and (2) manifesting a complete and voluntary renunciation of his criminal purpose.

"(b) For purposes of this section, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim."

[2] Although there was a concurring opinion expressing disagreement with a portion of the majority opinion, the seven person court, which included Chief Justice Peters and Justice Santaniello, unanimously agreed that the defendant is entitled to a jury instruction on a defense for which there is any foundation in the evidence. *State* v. *Belle,* 215 Conn. 257, 275, 576 A.2d 139 (1990).

[3] Our standard of review is clear: "When we are reviewing a trial court's failure to charge as requested, we must adopt the version of the facts most favorable to the defendant which the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Havican,* 213 Conn. 593, 595, 569 A.2d 1089 (1990); see *State* v. *Rouleau,* 204 Conn. 240, 250, 528 A.2d 343 (1987) ("[w]hether the defense . . . was 'raised' at the trial must be determined by viewing the record in a light most favorable to the defendant's claim").

Because renunciation is a defense, rather than an affirmative defense; *State* v. *Rouleau,* supra, 249–50 n.12; the state bears the burden of disproving the defense beyond a reasonable doubt once the issue has been raised at trial. General Statutes § 53a-12. As a result, if the renunciation issue is raised by the evidence, the state must prove that the defendant did *not* terminate complicity prior to the commission of the offense by "(1) [w]holly depriving it of effectiveness in the commission of the offense, and (2) manifesting a complete and voluntary renunciation of his criminal purpose." General Statutes § 53a-10. In this case the defendant squarely raised the renunciation issue by filing an appropriate written request to charge on the defense of renunciation. He also took an exception to the court's charge when it failed to instruct the jury on the issue.

I gather from the majority opinion that it is conceded that there was sufficient evidence to satisfy the second statutory requirement that the defendant manifest a "complete and voluntary renunciation of his criminal purpose." Surely, there can be no doubt that there was sufficient evidence to satisfy this requirement. Although the defendant did not take the stand, Detective DiLullo testified that the defendant had given a voluntary statement. According to DiLullo, the defendant admitted that he had been with Sims in the victim's cab until Sims pulled out a gun and attempted to rob the victim. Upon seeing the handgun, the defendant stated, he "opened the door of the cab and ran away from the cab." He further stated that he was approximately one and one-half blocks away from the point at which he had abandoned the cab when he heard a gunshot.

The majority holds that the renunciation instruction was not warranted in this case because the defendant failed to introduce some evidence for the first statu-

tory requirement—namely, evidence to show that he wholly deprived his complicity of effectiveness in the commission of the offense. The state's theory was that the defendant supplied Sims with the gun that was used to murder the victim. Accordingly, the majority holds that because the defendant "procured the murder weapon," he was required to produce some evidence that he took back the weapon, or disposed of it so that it could play no role, in order to be entitled to the instruction. I agree with the majority opinion that *if the jury was required to find* from the evidence that the defendant supplied or made available the gun, the renunciation instruction would have been available only if the defendant had introduced evidence that he attempted to take back the weapon or in some other manner deprived Sims of its use. The majority's analysis is flawed, however, because it is predicated on the assumption that the jury was *required* to conclude that the defendant made the gun available to Sims. This was not the case.

The defendant was entitled to an instruction on the renunciation defense once he introduced evidence that he did not know about the gun prior to the time Sims produced it in the cab. If the defendant did not know about the gun, but only about the underlying robbery, he could terminate his complicity in the robbery and wholly deprive his complicity of effectiveness in the commission of the offense, without attempting to take back the weapon or dispose of it. Under the statute, the defendant is only required to renounce his part in the crime. Accordingly, if the defendant knew only of the robbery and not of the gun, fleeing from the car before the robbery occurred so as to terminate his part in the crime would be enough evidence justifying an instruction on renunciation.[4]

---

[4] "The general principle advanced is that the accomplice must deprive his prior action of its effectiveness. The action needed for that purpose will,

The record supplies ample evidence that the defendant did not know about the gun. DiLullo testified that the defendant stated that he had never seen the gun before, which contradicts the evidence that he supplied the gun. Surely, this was sufficient evidence to make renunciation a jury issue—that is, if the jury found that he did not furnish the weapon, then there was no need for the defendant to produce evidence that he attempted to take back the weapon.

In addition, the renunciation instruction should have been given in this case because there was no direct evidence that the defendant gave Sims the weapon. The evidence included the following: (1) the day before the crime, Roberts, at his apartment, gave the defendant the pistol while Sims was there; (2) the defendant and Sims left Robert's apartment together; (3) the morning following the shooting the defendant told Roberts that he had thrown the gun away. Surely, the jury could have inferred from this evidence that the defendant gave the gun to Sims. But they were not required to draw such an inference; *State* v. *Price,* 205 Conn. 616, 622, 534 A.2d 1196 (1987); and they could have concluded that he did not supply the gun.

Under the facts of this case and the state's theory, the defendant would not be required to show that he took back the gun unless there was conclusive evidence that the defendant supplied the gun to Sims.[5] Because

of course, vary with the accessorial behavior. If the behavior consisted of aid, as by providing arms, a statement of withdrawal ought not to be sufficient; what is important is that he get back the arms, and thus wholly deprive his aid of its effectiveness in the commission of the offense. If, on the other hand, complicity inhered in request or encouragement, countermanding disapproval may suffice to nullify its influence, providing it is heard in time to allow reconsideration by those planning to commit the crime." I A.L.I., Model Penal Code and Commentaries (1985) § 2.06 (6) (c), comment, p. 326, and cases cited therein.

[5] For example, if the defendant had testified and judicially admitted that he furnished the gun used in the crime.

that evidence could only be drawn from inferences that the jury was free to accept or reject, the defendant would have been entitled to the instruction even if he had not affirmatively introduced any evidence that he did not furnish the gun. For all we know, the jury may have found that he did not furnish the gun. Under these circumstances, the defendant would not have been obligated to get back the gun from Sims.

The majority maintains, however, that the evidence does not show that the defendant had "terminated his complicity" in the offenses charged, but only that he *had* no such complicity. The majority therefore suggests that if the defendant's theory was that there was no complicity, then there was no justification for instruction on the renunciation defense because the defense is only available to one who is prosecuted for accomplice liability pursuant to General Statutes § 53a-8. The record reveals, however, that the trial court clearly instructed the jury on accomplice liability in reference to the robbery charge. The court charged the jury "as to what is called in our law, being an accessory to a crime. I refer to this doctrine with respect to the element of robbery or attempted robbery contained in the murder charge. A person is criminally liable for a criminal act if he directly commits it or if he is an accessory in the criminal act of another." Thus, the jury could have predicated its finding of guilt on a finding that the defendant had been an accomplice in the commission of the robbery. Accordingly, he was entitled to an instruction on the renunciation defense.

Accordingly, I would reverse the defendant's conviction and remand the case for a new trial.